UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

APPROXIMATELY $21,248,434.25 IN U.S. CURRENCY, DEPOSITED WITH THE CLERK OF COURT OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, AND ENTERED AS TO NAMAN WAKIL WITH RECEIPT #FLS100234601,

        Defendant *In Rem*.

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

PLAINTIFF, United States of America, by and through the undersigned Assistant United States Attorneys for the Southern District of Florida, hereby files this civil complaint for forfeiture *in rem* and alleges as follows:

## I. INTRODUCTION

1. This is a civil action for forfeiture *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(A), (C), the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the Federal Rules of Civil Procedure, to forfeit an asset that constitutes proceeds of foreign bribery offenses, property involved in money laundering or a conspiracy to commit money laundering, and/or property traceable to such property. This asset, and its current location, is more fully described as (the "Defendant Asset"):

> Approximately $21,248,434.25 in U.S. currency, deposited with the Clerk of Court of the United States District Court for the Southern District of Florida, and entered as to Naman Wakil with receipt #FLS100234601.

## II.     JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter. *See* 28 U.S.C. §§ 1345, 1355(a).

3. This Court has *in rem* jurisdiction over the Defendant Asset. *See* 28 U.S.C. § 1355(b).

4. Venue for this action is proper in the Southern District of Florida because acts or omissions giving rise to the forfeiture occurred in this District, the Defendant Asset is located in this District. *See* 28 U.S.C. §§ 1355(b)(1), 1395.

## III.    FACTUAL ALLEGATIONS

### A.     **Relevant Individuals and Entities**

5. Corporacion de Abastecimiento y Servicios Agricola ("CASA") was the Venezuelan state-owned food supply company. The Venezuelan government created CASA with the objective of guaranteeing the supply of food for the people of the country.

6. Venezuelan Official 1 was a high-ranking official of CASA from in or around 2010 to in or around 2011. Venezuelan Official 1 was a "foreign official" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

7. Venezuelan Official 2 was a high ranking official of CASA from in or around 2011 to in or around 2014. Venezuelan Official 2 was a "foreign official" as that term is used in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

8. Co-Conspirator 1 was a Venezuelan citizen. Co-Conspirator 1 was a "person" as that term is used in the FCPA, 15 U.S.C. § 78dd-3(f)(1).

9. Co-Conspirator 2 was a Venezuelan citizen and relative of Venezuelan Official 2. Co-Conspirator 2 was a "person" as that term is used in the FCPA, 15 U.S.C. § 78dd-3(f)(1).

10. Naman Wakil ("Wakil") was a Venezuelan citizen who became a permanent resident in the United States in or around 2012.

11. Wakil owned or controlled multiple companies that received payments from CASA, including but not limited to Doux Frangosul Agro Avicola Industrial, S.A. ("Doux Frangosul") and Michi Foods, S.A. ("Michi Foods") (the "Wakil Food Companies").

12. Between in or around 2010 and in or around 2012, Doux Frangosul maintained a bank account in the Cayman Islands with Investors Trust Assurance ("ITA") (the "Doux Frangosul ITA Account"). Wakil also maintained a personal bank account at ITA (the "Wakil ITA Account") and an account at Credit Suisse ("Wakil Corporate CS Account").

13. Between in or around 2012 and in or around 2016, the Wakil Food Companies maintained bank accounts in Switzerland at Compagnie Bancaire Helvètique ("CBH"). Wakil had signatory authority on the following CBH accounts, among others, for the Wakil Food Companies:

   a. Doux Frangosul, account number x0656 (the "Doux CBH Account"); and

   b. Michi Foods, account number x0657 (the "Michi CBH Account").

14. Wakil also maintained several additional, personal bank accounts in Switzerland, including the following accounts:

   a. CBH account number x0866 (the "Wakil CBH Account").

   b. Pictet & Cie, account number x2127 (the "Wakil Pictet Account");

   c. Reyl & Cie account number x6315 (the "Wakil Reyl Account"); and

   d. Schroder account number x1689 (the "Wakil Schroder Account").

### B. Overview

15. Beginning in or around 2008, Wakil engaged in a scheme to pay bribes to senior officials at CASA, including Venezuelan Officials 1 and 2, to obtain food contracts for the Wakil Food Companies.

16. Between in or around 2008 and in or around 2014, as a result of these bribe payments, the Wakil Food Companies received over $250 million in U.S. currency from CASA in accounts held in Switzerland and Cayman Islands.

17. These illicit bribery proceeds were laundered through accounts in Switzerland, Cayman Islands, and the United States, including to post bond for Wakil after he was arrested on federal money laundering charges in the Southern District of Florida. Wakil passed away on or about July 24, 2023.

### C. Bribes to Venezuelan Official 1 for CASA Contracts

18. In or around 2010, Wakil met Venezuelan Official 1 at Wakil's office building in Caracas, Venezuela.

19. At that meeting, Wakil offered bribes to Venezuelan Official 1 to ensure that Wakil Food Companies' existing contracts (also obtained by bribery) would not be canceled and to obtain future CASA contracts.

20. Wakil told Venezuelan Official 1 that Wakil had bribed senior officials at CASA before Venezuelan Official 1 took over at CASA.

21. Venezuelan Official 1 agreed to receive bribes in exchange for securing Wakil Food Companies' CASA contracts.

22. From in or around 2010 to in or around 2011, based on unlawful bribe agreements with Venezuelan Official 1 and others, Wakil received a total of approximately $30 million in U.S. currency from CASA in the Doux Frangosul ITA Account held in the Cayman Islands.

23. In or around August 2010 and in or around September 2010, Wakil wire transferred, as bribe payments, a total of at least approximately $720,000 in U.S. currency from the Doux Frangosul ITA Account to a bank account of a shell company established for the benefit of Venezuelan Official 1.

24. To conceal and disguise the true nature of the bribe payments, Wakil provided invoices to ITA falsely indicating that the payments were for, among other things, logistical services and customs paperwork.

25. On or about September 20, 2010, among other CASA contracts, Venezuelan Official 1 signed a contract for CASA to pay the Doux Frangosul approximately $3.8 million in U.S. currency to supply a certain amount of chicken.

26. Wakil also transferred proceeds received in the Doux Frangosul ITA Account from the corruptly obtained contracts to intermediary accounts, including the Wakil ITA Account, the Wakil Corporate CS Account, and the Wakil Schroder Account, and a portion of these funds funded the Defendant Asset.

          **D.**     **Bribes to Venezuelan Official 2 for CASA Contracts**

27. In or around 2011 or 2012, Wakil met Venezuelan Official 2 in Caracas, Venezuela. Wakil agreed to make corrupt payments to Venezuelan Official 2 to retain and obtain contracts with CASA for the Wakil Food Companies and receive payment on those contracts.

28. Wakil agreed to make these corrupt payments to Venezuelan Official 2 through Co-Conspirator 2.

5

29.     In or around 2012, Wakil caused Co-Conspirator 1 to set up bank accounts in Switzerland in the name of a shell company for the benefit of Co-Conspirator 2 and Venezuelan Official 2.

30.     From in or around 2012 to in or around 2015, the Wakil Food Companies received approximately $225 million through incoming wire transfers from CASA to CBH accounts in Switzerland, including a total of approximately $156 million in U.S. currency in the Doux CBH Account and the Michi CBH Account.

31.     From in or around 2012 to in or around 2014, Wakil wire transferred, as bribe payments, a total of approximately $11 million in U.S. currency from the Wakil Food Companies' accounts in Switzerland, including at CBH, to the shell company bank account controlled by Co-Conspirator 2 for the benefit of Venezuelan Official 2.

32.     To conceal and disguise the true nature of these bribe payments, Wakil provided invoices to CBH falsely stating that the payments were for, among other things, logistical services and customs paperwork.

33.     Wakil also transferred proceeds received in the CBH accounts from the corruptly obtained contracts to intermediary accounts, including the Wakil CBH Account and the Wakil Pictet Account, and a portion of these funds funded the Defendant Asset.

### E.     Laundering of Bribery Proceeds

34.     As a result of the above-described bribery schemes, CASA paid millions in U.S. currency to Wakil, which money was laundered and funded the Defendant Asset.

35.     As a result of the bribes to Venezuelan Official 1, and after the Doux Frangosul ITA Account received proceeds from CASA from the illicitly obtained contracts, criminal

proceeds were further transferred and laundered to other ITA accounts in the Cayman Islands, and then to accounts in Switzerland held or controlled by Wakil.

36. Between in or around November and in or around December 2010, a total of approximately $1.5 million in U.S. currency in criminally derived proceeds was transferred from the Doux Frangosul ITA Account to an account at ITA in the Cayman Islands, held by a company listing Venezuelan Official 1 and Wakil as its owners.

37. Between in or around March 2010 and September 2011, at least a total of approximately $8 million in criminally derived proceeds was transferred from the Doux Frangosul ITA Account to the Wakil ITA Account in the Cayman Islands.

38. On or about September 23, 2011, approximately $4,000,000 in U.S. currency in criminally derived proceeds was transferred from the Wakil ITA Account to the Wakil Corporate CS Account in Switzerland.

39. On or about April 10, 2012, approximately $3,800,000 in U.S. currency in criminally derived proceeds was transferred from the Wakil Corporate CS Account to the Wakil Schroder Account in Switzerland.

40. On or about October 10, 2014, approximately $5,036,079.44 in U.S. currency in criminally derived proceeds was transferred from the Wakil Schroder Account to the Wakil Pictet Account in Switzerland.

41. In addition, as a result of the bribes to Venezuelan Official 2, and after the Wakil Food Companies' CBH accounts received proceeds from CASA from the illicitly obtained contracts, criminal proceeds were further transferred and laundered to other accounts in Switzerland held or controlled by Wakil.

42.     Between on or about February 3, 2012, and on or about April 23, 2014, CASA transferred a total of approximately $78,541,796 in U.S. currency in criminally derived proceeds to the Doux CBH Account in Switzerland.

43.     During this time period, CASA was the primary source of deposits into the Doux CBH Account in Switzerland. Prior to these transfers, the Doux CBH Account had a balance of approximately $114,737.80 in U.S. currency, which was also attributable to illegally obtained CASA contracts based on this later account activity.

44.     Between on or about May 29, 2012, and on or about January 20, 2015, CASA transferred a total of approximately $77,726,699 in U.S. currency in criminally derived proceeds to the Michi CBH Account in Switzerland.

45.     Between on or about January 4, 2012, and on or about February 17, 2014, a total of approximately $29,030,000 in U.S. currency in criminally derived proceeds was transferred from the Doux CBH Account to the Michi CBH Account in Switzerland.

46.     Between on or about February 17, 2014, and on or about May 22, 2014, a total of approximately $21,000,000 in U.S. currency in criminally derived proceeds was transferred from the Doux CBH Account to the Wakil CBH Account in Switzerland.

47.     On or about June 2, 2014, approximately $20,000,000 in U.S. currency in criminally derived proceeds was also transferred from the Michi CBH Account to the Wakil CBH Account.

48.     On or about June 26, 2014, approximately $12,000,000 in U.S. currency in criminally derived proceeds was transferred from the Wakil CBH Account to the Wakil Pictet Account in Switzerland.

49.     Prior to that transfer, the Wakil Pictet Account had a zero balance.

50. On or about July 3, 2015, approximately $16,763,204.76 in U.S. currency in criminally derived proceeds was transferred from the Wakil Pictet Account to the Wakil Reyl Account.

51. On or about July 21, 2015, approximately $662,978.51 in U.S. currency in criminally derived proceeds was also transferred from the Wakil Pictet Account to the Wakil Reyl Account.

52. On or about April 4, 2016, approximately $5,000,000 in U.S. currency in criminally derived proceeds was transferred from the Michi CBH Account to the Wakil Reyl Account.

53. Prior to these transfers, the Wakil Reyl Account had a zero balance. The Wakil Reyl Account was an investment account used to purchase bonds and equities, which remained in the account.

54. From in or around 2016 to in or around July 2020, the Wakil Reyl Account was predominately funded by quarterly interest payments from investments. During this time period, the value of cash and investments in the Wakil Reyl Account did not fall below approximately $20,800,000 in U.S. currency.

55. As of on or about July 31, 2020, the balance in the Wakil Reyl Account was approximately $21,246,285 in U.S. currency, consisting of approximately 85.98% bond investments, approximately 8.79% liquidities, and approximately 5.23% equities and equity funds.

### F. Wakil's Criminal Indictment and Bond

56. On or about July 29, 2021, Wakil was indicted in the Southern District of Florida for FCPA violations and money laundering offenses. *United States v. Naman Wakil*, Case No. 21-cr-20406-KMW (S.D. Fla.).

57. On August 4, 2021, Wakil was taken into custody by federal authorities as a result of those charges.

58. To secure his pretrial release, Wakil posted bond with the Clerk of Court of the United States District Court for the Southern District of Florida.

59. On or about August 11, 2021, approximately $21,248,434.25 in U.S. currency in criminally derived proceeds was transferred from the Wakil Reyl Account in Switzerland to the U.S. District Court for the Southern District of Florida, to post Wakil's bond.

60. Based on reports, Wakil passed away on or about July 24, 2023.

61. Because of his death, Wakil's criminal indictment is due to be dismissed.

## IV.   BASIS FOR FORFEITURE

62. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 and 1957], or any property traceable to such property" is subject to forfeiture to the United States.

63. Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to any violation of . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense" is subject to forfeiture to the United States.

64. Pursuant to 18 U.S.C. § 1957, it is a federal crime to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

65. Pursuant to 18 U.S.C. § 1956(h), it is a federal crime to conspire to commit any offense in violation of 18 U.S.C. § 1956 or 1957.

66. A "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(iv) to include, among other things: (i) with respect to a financial transaction occurring, in part, in the United States, a foreign offense involving bribery of a public official, and the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; and (ii) a felony violation of the FCPA.

67. Bribery of a public official is a criminal offense in Venezuela. Venezuela's Anti-Corruption Law of April 7, 2003 (amended on November 19, 2014) prohibited public officials in Venezuela from, among other things, receiving or agreeing to receive, money, on their own behalf or through others, relating to any act taken in the course of his/her official duties responsibilities.

68. The FCPA, as amended, 15 U.S.C. § 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of influencing the foreign official, including the foreign official to take or omit certain acts, and securing an improper advantage in order to assist those classes of persons in obtaining or retaining business for, or directing business to, any person.

69. Pursuant to the FCPA, 15 U.S.C. § 78dd-2, it is a federal crime "to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign official for purposes of . . . influencing any act or decision of such foreign official in his official capacity, . . . inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or . . . securing any improper advantage; or . . . inducing such foreign official to use his influence

with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person."

70. Pursuant to the FCPA, 15 U.S.C. § 78dd-3, it is a federal crime "corruptly to make use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign official for purposes of . . . influencing any act or decision of such foreign official in his official capacity, . . . inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or . . . securing any improper advantage; or . . . inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such person in obtaining or retaining business for or with, or directing business to, any person."

### FIRST CLAIM
**Proceeds of Foreign Bribery Offenses**
**(18 U.S.C. § 981(a)(1)(C))**

71. The factual allegations in paragraphs 1 to 61 are re-alleged and incorporated by reference herein.

72. As set forth above, the Defendant Asset constitutes or was derived from proceeds traceable to a foreign offense involving bribery of a public official that occurred, in part, in the United States, and/or a conspiracy to commit such offense.

73. Accordingly, the Defendant Asset is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM
### Proceeds of FCPA Offenses
### (18 U.S.C. § 981(a)(1)(C)

74.     The factual allegations in paragraphs 1 to 61 are re-alleged and incorporated by reference herein.

75.     As set forth above, the Defendant Asset constitutes or was derived from proceeds traceable to FCPA offenses in violation of 15 U.S.C. § 78dd-1, *et seq.*

76.     Accordingly, the Defendant Asset is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## THIRD CLAIM
### Property Involved in Money Laundering Conspiracy
### (18 U.S.C. § 981(a)(1)(A))

77.     The factual allegations in paragraphs 1 to 61 are re-alleged and incorporated by reference herein.

78.     As set forth above, the Defendant Asset was involved in transactions or attempted transactions in a conspiracy to commit an offense in violation of 18 U.S.C. §§ 1956 and/or 1957, and/or constitute property traceable to such property.

79.     Accordingly, the Defendant Asset is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM
### Property Involved in Laundering Transactions Greater than $10,000
### (18 U.S.C. § 981(a)(1)(A))

80.     The factual allegations in paragraphs 1 to 61 are re-alleged and incorporated by reference herein.

81. As set forth above, the Defendant Asset was involved in transactions in property of a value greater than $10,000 that was derived from specified unlawful activity in violation of 18 U.S.C. § 1957, and/or constitutes property traceable to such property.

82. Accordingly, the Defendant Asset is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE**, Plaintiff, the United States of America requests that: the Court, upon a finding of probable cause, issue a warrant for arrest of the Defendant Asset; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Asset; that the Defendant Asset be forfeited and condemned to the United States; and such other and further relief as this Honorable Court may deem just, necessary, and proper.

Respectfully submitted,

**MARKENZY LAPOINTE**
**UNITED STATES ATTORNEY**

By:   *s/ Marx P. Calderón*
Marx P. Calderón
Assistant United States Attorney
Court ID No. A5502700
99 N.E. 4th Street, 7th Floor
Miami FL, 33132-2111
Telephone: (305) 961-9036
E-mail: Marx.Calderon@usdoj.gov


*s/ Joshua Paster*
Joshua Paster
Assistant United States Attorney
Court ID No. A5502616
99 N.E. 4th Street, 7th Floor
Miami FL, 33132-2111
Telephone: (305) 961-9342
Email: Joshua.Paster@usdoj.gov

*Counsel for United States of America*

## **VERIFICATION**

I, Patricia Gonzalez, hereby verify and declare, under penalty of perjury, that I am a Special Agent with Internal Revenue Service-Criminal Investigation ("IRS-CI") and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of IRS-CI.

Executed on this 8th day of August, 2023.

_____
Patricia Gonzalez
Special Agent
Internal Revenue Service-Criminal Investigation